FILED

2016 AUG 25  AM 9: 13

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
          DEPUTY

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

BANCPASS, INC.,

**Plaintiff,**

-vs-                                                                    **Case No.  A-14-CA-1062-SS**

**HIGHWAY TOLL ADMINISTRATION, LLC,**
                               **Defendant.**

_____

## O R D E R

BE IT REMEMBERED on the 29th day of July 2016 the Court held a hearing in the above-styled cause, and the parties appeared by and through counsel.  Before the Court are Plaintiff BancPass, Inc.'s Motion for Partial Summary Judgment and Rule 12(c) Motion to Dismiss Defendant's Requests for Declaratory Relief Counts I, II, and III [#86], Defendant Highway Toll Administration, LLC's Response [#91] thereto, and Plaintiff's Reply [#98] in support; and Defendant's Motion for Traditional Summary Judgment on Plaintiff's Claims and Partial Summary Judgment on Defendant's Counterclaim [#84], Plaintiff's Response [#92] thereto, and Defendant's Reply [#99] in support.  Having considered the documents, the governing law, the arguments of the parties at hearing, and the case file as a whole, the Court now enters the following opinion and orders.

### Background

This is a defamation and declaratory judgment action involving competing providers of electronic highway toll payment technologies.  Plaintiff BancPass, Inc. is the creator of PToll, a

toll-payment smartphone application; Defendant Highway Toll Administration, LLC (HTA), a private New York limited liability company, is the largest provider of toll processing services to the rental car industry.  According to BancPass, on the eve of PToll's debut, HTA successfully thwarted the PToll rollout by disseminating defamatory letters about BancPass and PToll.  HTA denies BancPass's defamation allegations and claims the PToll app tortiously interferes with its contractual rights.

## I.      Facts

Traditionally, state tolling authorities collected tolls from drivers via cash collection booths stationed along toll roads.  Today, however, many tolling authorities, including the Texas Department of Transportation (TxDOT), collect tolls either partially or entirely through the use of electronic tolling lanes.  When a driver drives through an electronic tolling lane, the state tolling authority generally collects the toll from the driver in one of two ways: via a "toll tag," a windshield-mounted transponder device pre-purchased by the driver that automatically deducts the toll from the driver's pre-paid account, or, by photographing the vehicle's license plate, using that photograph to identify the vehicle's registered owner, and then mailing the registered owner a bill for the toll.

This system creates an obvious administrative problem when the driver using the toll road is driving a rented vehicle, lacks a state-specific toll tag, and cannot pay cash, either because the toll road is not equipped to receive cash payments or for personal reasons. Electronic toll processing companies like BancPass and HTA solve this problem by registering the license plate numbers of particular rental vehicles to their "fleets," paying the tolling

authority directly for tolls incurred by those vehicles, and then billing the rental car customers for the cost of their accrued tolls plus a fee for their services.

HTA processes tolls in this manner for approximately 3.7 million rental cars across the nation, the license plates of which are registered to HTA's fleet.  Its two primary customers are Avis Budget Group, Inc. (Avis) and Enterprise Holdings, Inc. (Enterprise), which operate the rental car brands Avis Car Rental, Budget Car Rental, Payless Car Rental, Enterprise Rent-A-Car, National Car Rental, and Alamo Rent a Car.  Both Avis and Enterprise executed service agreements with HTA in which they agreed HTA would be their exclusive provider of electronic toll processing services.  *See* Def.'s Mot. Summ. J. [#84-1] Ex. A (Avis Service Agmt.) at ¶ 6 ("During the term, [Avis] shall not obtain from any other party, nor shall it provide on its own behalf or account, any electronic tolling collection services[.]"); *id.* [#84-2] Ex. B (Enterprise Service Agmt.) at ¶ 12 ("The parties hereby acknowledge and agree that HTA shall be the exclusive provider to Enterprise and its affiliates . . . of all ETC [Electronic Toll Collection] services[.]").

Avis and Enterprise, of course, require their customers to sign a rental agreement before turning over the keys to a rental car.  Avis rental agreements contain the following provisions concerning electronic toll processing services:

> **e-Toll.**  If you do not pay cash for tolls or the roadway does not accept cash payment you automatically opt into our e-Toll service, pursuant to which you agree to pay us or our toll program administrator . . . for all tolls incurred during your rental and all related fees, charges and penalties. . . .  You can avoid the . . . fee[s] and any other charges by paying the toll in cash, using your electronic toll device, or avoiding any cashless toll road or passage.

Def.'s Mot. Summ. J. [#84-3] Ex. C (Avis Rental Agmts.) at 3 ¶ 16, 5 ¶ 16, 7 ¶ 16.  Enterprise rental agreements also contain provisions related to electronic toll processing services:

Optional Charges.  The optional Tollpass Service accepted by Renter provides for the daily rental of a toll collection transponder or, in some states, the use of video-monitored toll collection services.  In addition to the daily charge for the Tollpass Service, [Enterprise], its affiliate or a third party may separately charge . . . for each toll (or other charge) incurred using the transponder or video monitored service . . . .

Renter shall pay [Enterprise], its affiliates or agents . . . [a] Tollpass Convenience Charge (TCC) . . . for each day Vehicle is operated on a TCC Covered Road and Vehicle operator does not pay an applicable toll.

*Id.* [#84-4] Ex. D (Enterprise Rental Agmts.) at 4 ¶ 3(b)(5), (c)(4); 8 ¶ 3(b)(5), (c)(4); 10 ¶ 3(b)(5), (c)(5).[1]

BancPass is a direct competitor of HTA in the electronic toll processing space.  A user of the PToll app can pay tolls incurred while driving any vehicle simply by downloading the app, using it to take a photograph of the vehicle's license plate, entering the dates he or she will be driving the vehicle, and providing a credit card number.  Using the license-plate photo, BancPass registers the vehicle to its fleet, pays the tolling authority for the user's tolls, and then charges the user's credit card.

BancPass released PToll in April 2014 and subsequently announced it would officially launch the app by offering it for free to all attendees of the September 2014 International Bridge, Tunnel and Turnpike Association (IBTTA) national conference, the most influential annual conference in the tolling industry.[2]  In July 2014, however, HTA learned BancPass customers could use PToll to pay tolls incurred in vehicles rented from Avis and Enterprise brands.  Upon

---

[1] The language of the Alamo-brand rental agreement is slightly, immaterially different: "The optional Tollpass service accepted by Renter provides for the daily rental of a toll collection transponder . . . or, in some states, the use of video-monitored toll collection services . . . .  Renter shall pay [Enterprise], its affiliates or agents . . . [a] Tollpass convenience charge (TCC) . . . for each day Vehicle is operated on a Tollpass Automatic Service covered road and Vehicle operator does not pay an applicable toll."  Enterprise Rental Agmts. at 10 ¶ 3(b)(5), (c)(5).

[2] "The [IBTTA] is the worldwide association representing toll facility owners and operators and the businesses that serve them."  *About Us*, IBTTA, http://www.ibtta.org/about-us.

learning this information, HTA took several steps which together kept BancPass from successfully launching PToll at the IBTTA conference.

First, on August 13, 2014, HTA wrote a letter to TxDOT "express[ing] [its] concern with the actions recently undertaken by . . . BancPass," and particularly with BancPass's "concerted effort recently to register with TxDot [sic] the license plates of vehicles owned by other parties, namely the rental agencies." Def.'s Resp. [#84-7] Ex. G (TxDOT Letter) at 3. The letter further informed TxDOT that HTA would be "work[ing] with the rental agencies and . . . outside counsel to take any and all legal actions necessary to protect [its] rights[.]" *Id.* After receiving the letter, TxDOT withdrew its necessary support for PToll,[3] rendering PToll unable to function properly in time for the conference. *See* Pl.'s Mot. Summ. J. [#86-12] Ex. J (Sept. 2, 2014 Email) at 1 (forwarded message from TxDOT Toll Operations Division employee confirming "[t]he 'PToll' app will not be available for IBTTA attendees during the September 2014 conference").

Second, HTA wrote letters to both Apple and Google—the two platforms via which smartphone users can search for and purchase smartphone apps, including PToll—requesting they remove PToll from the App Store and Google Play, respectively. *See* Def.'s Resp. [#84-9, -10] Exs. I, J (Apple/Google Letters). The letters, which were sent by HTA's then-counsel Kronenberger Rosenfeld, LLP and are substantially identical, state in pertinent part:

**Re:   Illegal PToll App by BancPass**  [. . .]

[T]he express purpose of [PToll] is to permit users to circumvent the highway toll transponders installed in rental cars, and the associated fees. In order to do so,

---

[3] While not entirely clear from the pleadings, it appears the proper functioning of PToll depended upon TxDOT's willingness, at least at that time, to prioritize BancPass's fleet account differently, such that tolls incurred by vehicles with license plates registered both to BancPass *and* another entity would be charged to BancPass. *See* Pl.'s Mot. Summ. J. [#86-10] Ex. H (Deitiker Rep.) at 5. It is not clear if a change in the prioritization order has since occurred or remains necessary for PToll to properly function.

PToll users are required to assist in the violation of state vehicle registration laws . . . .  Many users of [PToll] probably do not realize that they are engaging in illegal conduct simply by using the App.  [. . .]

[Using PToll] is in violation of the laws of most (if not all) states prohibiting false statements to the State Authorities in conjunction with the registration of a vehicle or license plate. . . .  By misrepresenting, or assisting BancPass in misrepresenting, that a particular rental car and its license plate are part of BancPass's fleet when, in fact, they are not, PToll App users are unwittingly committing a felony.

The sale of [PToll] in [the App Store/Google Play] gives it an air of legitimacy. Accordingly, such sale is intentionally deceptive and unfairly induces users of [PToll] to participate in BancPass's unlawful schemes in violation of Section 17200 of the California Business and Professions Code. [. . .]

BancPass is intentionally interfering with the contract between the Rental Agencies and drivers to pay for all tolls using the technology installed in the vehicle. . . .  By offering [PToll] in [the App Store/Google Play], [Apple/Google] is facilitating this tortious conduct.

Through [PToll], BancPass is illegally amassing a fleet list of cars it does not own . . . .  BancPass's amassing of such a list . . . raises other privacy and ethical concerns.  The bottom line, however, is that BancPass is requiring users of the PToll app to help it break the law.  Accordingly, the PToll app should be removed from [the App Store/Google Play].

*Id.*  After receiving this letter, Google temporarily removed PToll from the Google Play store on

October 6, 2014.  *See* Pl.'s Mot. Summ. J. [#86-13] Ex. K (Oct. 7, 2014 Email) at 2.  Apple did

not respond to HTA's letter.

## II.     Procedural History

BancPass initiated this action on October 29, 2014, by filing its Original Petition in the

98th Judicial District Court of Travis County, Texas.  *See* Notice Removal [#1-4] Ex. A-1 (Orig.

Pet.).  In the Original Petition, BancPass raised claims for: (1) tortious interference with contract

and prospective business relations; (2) a declaratory judgment PToll does not tortiously interfere

with HTA's contracts; and (3) a declaratory judgment any agreement not to market PToll to rental car users would violate the Sherman Act. *See id.* ¶¶ 24–42.

HTA removed the case to this Court on November 24, 2014, invoking the Court's diversity and federal question jurisdiction, *see id.* [#1] ¶¶ 5–9, and subsequently filed a motion to dismiss BancPass's original petition, which the Court denied on December 17, 2014, *see* Order of Dec. 17, 2014 [#9]. HTA counterclaimed on April 22, 2015, seeking declaratory relief negating BancPass's claims. *See generally* Countercl. [#12]. BancPass filed its First Amended Complaint on September 3, 2015, adding a cause of action for defamation. *See* First Am. Compl. [#27] ¶¶ 25–29.

Following additional motions practice, on December 2, 2015, HTA filed its First Amended Counterclaim, the presently operative counter-pleading. *See* First Am. Countercl. [#47]. In its First Amended Counterclaim, HTA seeks: (1) a declaratory judgment it did not tortiously interfere with BancPass's contracts with Google or Apple; (2) a declaratory judgment its contracts with car rental agencies do not tortiously interfere with BancPass's contracts with its customers; (3) a declaratory judgment it has not violated the federal or Texas antitrust laws; and (4) a declaratory judgment that the PToll app tortiously interferes with HTA's current and prospective contracts. *See id.* ¶¶ 16–43.

On January 6, 2016, BancPass filed its Second Amended Complaint, the currently operative pleading. *See* Second Am. Compl. [#50]. The Second Amended Complaint brings only two claims: first, a claim for defamation, and second, a claim seeking declaratory relief concerning tortious interference with HTA's contracts. *See id.* ¶¶ 26–39.

Following an extension of the dispositive motions deadline from May 2, 2016 to June 16, 2016, *see* Order of Apr. 18, 2015 [#58], and litigation of several discovery and pre-trial motions, *see* Order of June 1, 2016 [#80], the parties filed their motions for summary judgment and to dismiss. Shortly thereafter, the parties filed additional discovery motions, which the Court referred to the United States Magistrate Judge for decision. *See* Order of July 26, 2016 [#108]. While the additional discovery motions were pending, the parties briefed their motions for summary judgment and to dismiss, which are now ripe for decision.

## Analysis

## I. Legal Standard

### A. Motion to Dismiss—Rule 12(c)

Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). Motions for judgment on the pleadings are "designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (internal quotation marks omitted). "A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).

A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In deciding a motion to dismiss under 12(b)(6), a court generally accepts as true all

factual allegations contained within the complaint. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although a plaintiff's factual allegations need not establish the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.* Determining plausibility is a "context-specific task," that must be performed in light of a court's "judicial experience and common sense." *Id.* at 679. In deciding a motion to dismiss, courts may consider the complaint, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, such as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

**B.     Motion for Summary Judgment**

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508

(5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II.    Application

At this stage of the proceedings, there are two primary areas of dispute between the parties: first, whether HTA defamed BancPass by sending the above-described letters to Apple, Google, and TxDOT; and second, whether BancPass's PToll app tortiously interferes with the contracts between (a) HTA and the rental car companies, (b) the rental car companies and their customers, or (c) HTA and TxDOT. Despite the relative simplicity of this posture, the parties' motions are complex and at times internally inconsistent, making it difficult to ascertain the specific contours of their respective requests for relief. The parties do not even agree on what claims are presently live and ripe for decision. *See* Def.'s Resp. [#91] at 15 n.20; Pl.'s Reply [#98] at 7 n.6.

For the sake of clarification, the claims raised by the parties' pleadings are as follows. In its Second Amended Complaint, BancPass raises (1) a defamation claim (Count I) and (2) a claim seeking a declaration that PToll does not tortiously interfere with (a) HTA's contracts with Avis and Enterprise, (b) the rental agreements between Avis and Enterprise and their customers, or (c) the agreement between HTA and TxDOT (Count II). *See* Second Am. Compl. [#50] ¶¶ 34, 37. In its First Amended Counterclaim, HTA brings claims seeking declarations that: (1) HTA did not tortiously interfere with BancPass's contracts with Google or Apple (Count I); (2) HTA's contracts with Avis and Enterprise, as well as the rental agreements between Avis, Enterprise,

and their customers, "do not interfere with BancPass's ability to contract with customers" through PToll (Count II); (3) HTA has not violated federal or state antitrust law (Count III); and (4) PToll tortiously interferes with HTA's current or prospective contracts or contracts to which HTA is a third-party beneficiary (meaning the rental agreements between Avis, Enterprise, and their customers) (Count IV).

As the Court understands the pending motions for summary judgment, the following issues are ripe for decision: (1) whether Counts I, II, and III of HTA's counterclaims should be dismissed; (2) whether HTA is entitled to summary judgment on BancPass's defamation claim; (3) whether either party is entitled to summary judgment on the question whether PToll tortiously interferes with the agreements between Avis, Enterprise, and their customers; and (4) whether BancPass is entitled to summary judgment on the question whether PToll tortiously interferes with HTA's contracts with Avis and Enterprise;[4] and (5) whether BancPass is entitled to summary judgment on the question whether PToll tortiously interferes with the agreement between HTA and TxDOT.[5]

The Court addresses these matters in turn.

A.      **Counts I, II, and III of HTA's Counterclaims**

BancPass moves for dismissal of Counts I, II, and III of HTA's counterclaims, arguing none of the issues raised in these requests for declaratory relief "relate to any present case or controversy between the parties identified in the parties' pleadings." Pl.'s Mot. Summ. J. [#86] at 20.   The Court rejects BancPass's argument.   As HTA points out, it asserted these

---

[4] *See section* II.D, *infra.*

[5] During hearing on the parties' motions, the Court orally ruled from the bench that PToll does not constitute tortious interference with any of the relevant contracts as a matter of law, and thus explains those oral rulings fully in this opinion.

counterclaims for declaratory relief based on the claims for declaratory relief BancPass raised in its original and first amended complaint. BancPass answered the amended counterclaims on January 21, 2016. *See* Answer Countercls. [#53]. That BancPass subsequently amended its pleadings to drop its own claims for declaratory relief related to antitrust and HTA's alleged tortious interference with BancPass's contracts did not require HTA to drop its properly pleaded counterclaims. BancPass's motion to dismiss is therefore DENIED.

**B.    Defamation**

HTA argues it is entitled to summary judgment on BancPass's defamation claim because its letters to TxDOT, Apple, and Google (1) were absolutely privileged because they were made preliminarily to a proposed judicial proceeding and (2) express a legal opinion and therefore cannot be false statements of fact. Additionally, HTA argues BancPass is barred as a matter of law from seeking exemplary damages because it did not ask HTA to retract the allegedly defamatory statements with 90 days after making them.[6] As set forth below, the Court finds BancPass may not seek exemplary damages in connection with the TxDOT letter. In all other respects, HTA's arguments must be rejected.

**i.    Absolute privilege**

Texas law recognizes two classes of privilege applicable to defamation suits: absolute privilege and conditional privilege. *Shell Oil Co. v. Writt*, 464 S.W.3d 650, 654 (Tex. 2015) (citing *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex. 1987)). The absolute

---

[6] HTA further argues BancPass cannot recover mental anguish damages because it is an entity, not an individual. *See* Def.'s Mot. Summ. J. [#84] at 14–15. In its response, BancPass clarifies that it is not seeking mental anguish damages in this litigation. *See* Pl.'s Resp. [#92] at 13.

Additionally, BancPass moves for summary judgment on HTA's affirmative defense of truth to the defamation claims. *See* Pl.'s Mot. Summ. J. [#86] at 19–20. The Court declines to consider this argument on summary judgment, as it is more appropriately resolved on a full factual record to be developed at trial.

privilege "is more properly thought of as an immunity because it is based on the personal position or status of the actor. . . .   Such immunity, however, attaches only to a limited and select number of situations which involve the administration of the functions of the branches of government, such as statements made during legislative and judicial proceedings." *Id.* (quoting *Hurlbut*, 749 S.W.2d at 768).   A "witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding . . . , if it has some relation to the proceeding." *Id.* at 654–55 (quoting *Hurlbut*, 749 S.W.2d at 767).

The test for whether a communication is absolutely privileged when it occurs before judicial proceedings have begun has both subjective and objective components: "the rule . . . applies only when the communication has some relation to a proceeding that is actually contemplated in good faith and under serious consideration by the witness or a possible party to the proceeding." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 588 cmt. e) (alteration omitted).   "The bare possibility that the proceeding might be instituted is not to be used as a cloak to provide immunity for defamation when the possibility is not seriously considered." *Id.* (quoting the RESTATEMENT).

In arguing its letters to TxDOT, Apple, and Google are absolutely privileged communications, HTA points the Court to no case in which the absolute judicial-proceeding privilege was extended to a situation analogous to this one. First, in *Daystar Residential, Inc. v. Collmer*, the court found an attorney's statements to newspapers made in advance of filing wrongful death lawsuits against two treatment centers were absolutely privileged. 176 S.W.3d 24, 26 (Tex. App.—Houston [1st Dist.] 2004, pet. denied).   The court made clear it was *extending* the privilege in so holding and emphasized "it [wa]s clear that a suit was being

contemplated" given the attorney's explicit statements "he w[ould] file a lawsuit alleging gross negligence this week" and that the information he publicly disclosed "bolster[ed] a civil lawsuit he plan[ned] to file in the near future." *Id.* at 28, 26. Here, the letters contain no such explicit statements regarding plans to file suit and were made to corporate entities, not the media. Second, *Shell Oil* involved statements made to the Department of Justice by an entity that knew it was the target of an ongoing DOJ investigation, and thus seriously feared it would soon be criminally prosecuted. *See* 464 S.W.3d at 659. Here, HTA was not the target of any investigation and was not making statements in an attempt to clear its name. Finally, *Russell v. Clark* involved an out-of-court letter sent by an attorney seeking evidence to be used in an existing judicial proceeding. *See* 620 S.W.2d at 866–67. Here, at the time HTA sent the letters in question, no judicial proceeding existed.

Considering the entirety of the letters in their context, the Court finds they bear no relation to a proposed judicial proceeding. The absolute privilege has been extended in Texas to "limited instances in which the benefit of the communication to the general public outweighs the potential harm to an individual." *See Shell Oil*, 464 S.W.3d at 655. The Court declines to extend absolute immunity from suit for defamation to unsolicited letters mailed to third parties, neither law enforcement nor media, by an aggrieved entity neither the target of any investigation nor an attorney advocating on behalf of a client. In the opinion of the Court, this is not an instance in which the benefit of the communication to the public outweighs the potential harm to an individual.

HTA's motion for summary judgment on this ground is DENIED.

### ii.    Expressions of legal opinion

HTA next argues it is entitled to summary judgment on BancPass's defamation claim because the statements made in the letters were "legal opinions regarding the implication of undisputed facts," and "thus like all opinions cannot constitute a false statement of fact." Def.'s Mot. Summ. J. [#84] at 12. The Court cannot agree with HTA.

"[T]he meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000)). Further, "the imputation of a corrupt or dishonorable motive in connection with established facts is itself to be classified as a statement of fact and as such not to be within the defense of fair comment." *Id.* at 583 (quoting *A.S. Abell Co. v. Kirby*, 176 A.2d 340, 343 (1961)). Here, even assuming the letters accurately set forth the facts they allege, at minimum, the letters HTA sent to Apple and Google appear to impute a dishonorable motive to BancPass in connection with those facts. Those letters, for example, state that "as BancPass has admitted . . . , the express purpose of the PToll App is to permit users to circumvent" HTA's fees, claim the sale of PToll "is intentionally deceptive," allege BancPass is "intentionally frustrating [HTA's services] for its own gain," and claim BancPass "is requiring users of the PToll App to help it break the law." *See* Apple/Google Letters at 1, 3. As these statements appear to impute a corrupt motive to BancPass, the Court declines to grant summary judgment to HTA on grounds the Apple and Google letters are merely opinion.

The Court further declines to grant summary judgment concerning the TxDOT letter on grounds it, as HTA argues, is a protected statement of legal opinion. The TxDOT letter does not

contain any direct accusations that BancPass or PToll users are breaking the law; rather, the letter describes HTA's concerns and states HTA will take the appropriate steps to protect its legal rights. *See* TxDOT Letter at 2.  Thus, no "legal opinion" is expressed in the TxDOT letter.  The Court expresses no opinion on whether the TxDOT letter is otherwise factual.

Consequently, HTA's motion for summary judgment on the merits of BancPass's defamation claim is DENIED in its entirety.

### iii.    Ability to seek exemplary damages

Finally, HTA contends BancPass is barred from seeking exemplary damages on its defamation claim because BancPass did not ask HTA to retract the letters within 90 days of learning HTA sent the letters.  HTA's argument is based upon a recently enacted statute, Section 73.055(c) of the Texas Civil Practice and Remedies Code, which provides a claimant may not recover exemplary damages if the person "does not request a correction, clarification, or retraction" of the allegedly defamatory publication "not later than the 90th day after receiving knowledge of the publication[.]"  TEX. CIV. PRAC. & REM. CODE § 73.055(c).  According to HTA, BancPass first received knowledge of the letters to Apple and Google when it received HTA's demand letter dated September 30, 2014, and first received knowledge of the letter to TxDOT when TxDOT sent it to BancPass in response to a records request on October 10, 2014.

BancPass does not respond to HTA's argument concerning the TxDOT letter, and the Court therefore finds BancPass may not recover exemplary damages in connection with that letter.  As for the Apple and Google letters, however, BancPass argues while it may have known the letters existed after receiving HTA's demand letter, BancPass did not know the specific contents of those letters (and particularly that HTA claimed the use of PToll amounted to a

felony) until it received those letters in discovery on April 10, 2015. BancPass explains it thereafter sent a retraction request, which HTA received 82 days later, and subsequently amended its pleadings to assert a defamation claim.

Neither party points the Court to any case specifically interpreting the meaning of "receiving knowledge" as used in § 73.055(c). This is unsurprising, as it appears only two Texas cases, one of which is unreported, even cite to § 73.005(c), and neither analyze it. *See Neely v. Wilson*, 418 S.W.3d 52, 63 & n.15 (Tex. 2013) (noting recent passage of § 73.005(c) and stating it does not apply to the case under review); *Cummins v. Bat World Sanctuary*, No. 02-12-00285-CV, 2015 WL 1641144, at 23 n.104 (Tex. App.—Fort Worth Apr. 30, 2015, pet. denied) (noting recent passage in a footnote). In the absence of on-point Texas law, the Court will make an *Erie* guess as to how the Texas Supreme Court would decide this question. *See Keen v. Miller Envt'l Group., Inc.*, 702 F.3d 239, 243 (5th Cir. 2012) (explaining the *Erie* guess obligation).

The Court concludes BancPass did not "receiv[e] knowledge" of the defamatory statements within the meaning of § 73.055(c) until it received the Apple and Google letters in discovery on April 10, 2015. A related subsection of the statute, § 73.055(d)(3), explains that "[a] request for a correction, clarification, or retraction is sufficient if it . . . states with particularity the statement alleged to be false and defamatory[,]" among other requirements. TEX. CIV. PRAC. & REM. CODE § 73.055(d)(3). HTA does not argue that BancPass could have obtained copies of its letters to Apple and Google merely by requesting them from either company or that BancPass could have otherwise determined, through the exercise of reasonable diligence, that HTA made allegedly defamatory statements in those letters. As such, it does not appear BancPass could have complied with the statute by "stat[ing] with particularity" the

allegedly false and defamatory statements prior to April 10, 2015, the date it received the letters. The Court declines to construe § 73.055(c) in a manner that makes it impossible to comply with § 73.055(d)(3). *See United States v. Marshall*, 798 F.3d 296, 308–09 (5th Cir. 2015) ("Where possible, statutes must be read in harmony with one another so as to give meaning to each provision." (citation omitted)).

As it is undisputed HTA received BancPass's request for retraction within 90 days after BancPass sent the request, the Court finds § 73.055(c) does not prevent BancPass from seeking exemplary damages with respect to the Apple and Google letters.

HTA's motion for summary judgment on this ground is DENIED.

## C.   BancPass's Alleged Tortious Interference with the Agreements Between Avis, Enterprise, and Their Customers

Both parties seek summary judgment on their requests for declaratory relief concerning BancPass's alleged tortious interference with the rental agreements between Avis, Enterprise, and their customers. The key question underlying these claims is whether the rental agreements in question prohibit customers from using PToll, as "a willful and intentional act of interference with the contract," an essential element of tortious interference with contract, can be established by proving, as HTA seeks to prove here, that the alleged tortfeasor (here, BancPass) induced a third party (here, the rental car customer) to breach his or her obligation under the contract. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *see John Paul Mitchell Sys. v. Randalls Food Mkts., Inc.*, 17 S.W.3d 721, 730–32 (Tex. App.—Austin 2000, pet. denied) (explaining intentional interference can be found where the defendant "took an active part in persuading a party to a contract to breach it"). As explained below, the Court finds BancPass does not induce rental car customers to breach their obligations under their rental

contracts by using PToll, and therefore that BancPass is entitled to summary judgment on Count II of its complaint and Count IV of HTA's counterclaim.[7]

BancPass argues the rental contracts unambiguously provide that a customer opts in to HTA's toll processing service only where the customer uses a toll road without otherwise making arrangements to pay tolls. HTA disagrees, arguing the rental contracts unambiguously prohibit the use of PToll or, in the alternative, are ambiguous on the question whether use of PToll is permissible, barring summary judgment. The Court agrees with BancPass.

When interpreting a contract, the primary concern is to ascertain and effectuate the written expression of the parties' intent. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). Intent is governed by what is written, not by what one side contends it intended but failed to say. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010). Thus, courts must give terms their plain and ordinary meaning unless the contract indicates the parties intended a different meaning, and examine the writing as a whole to harmonize and give effect to all of the contract's provisions. *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Courts must "also bear in mind the particular business activity to be served, and when possible and proper to do so, . . . avoid a construction that is unreasonable, inequitable, and oppressive." *NuStar Energy, L.P. v. Diamond Offshore*

---

[7] HTA makes the preliminary argument that BancPass lacks standing to assert its claim for declaratory relief on this issue because BancPass is neither a party nor an intended beneficiary of the rental agreements. *See* Def.'s Mot. Summ. J. [#84] at 8–9. The Court rejects this argument. Here, BancPass "has sufficient injury-in-fact to satisfy the Art. III case-or-controversy requirement," and as a prudential matter, "can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." *See Sec. of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984) (discussing third-party standing). Additionally, restricting BancPass's ability to market PToll to rental car customers prevents those customers from exercising their right to freedom of contract. *See U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 721 (1990). Finally, HTA has itself brought a claim for reciprocal declaratory relief, so the practical consequences of this question are minimal. Accordingly, the Court finds BancPass may assert its claim for declaratory relief concerning the rental contracts.

*Co.*, 402 S.W.3d 461, 466 (Tex. App.—Houston [14th Dist.], no pet.) (citing *Frost Nat'l Bank v.*

*L & F. Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005); *Reilly v. Rangers Mgmt., Inc.*, 727

S.W.2d 527, 530 (Tex. 1987)).

"Whether a contract is ambiguous is a question of law that must be decided by examining

the contract as a whole in light of the circumstances present when the contract was entered."

*Enter. Leasing Co. of Hous. v. Barrios*, 156 S.W.3d 547, 549 (Tex. 2004) (quoting *Columbia*

*Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)).   "If the

written instrument is so worded that it can be given a certain or definite legal meaning or

interpretation, then it is not ambiguous and the court will construe the contract as a matter of

law." *Id.* (quoting *Coker*, 650 S.W.2d at 393).  An ambiguity exists only if the contract language

is susceptible to two or more reasonable interpretations.  *Id.* (citing *Am. Mfrs. Mut. Ins. Co. v.*

*Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)).

Again, the Avis contracts provide:

> **e-Toll.**  If you do not pay cash for tolls or the roadway does not accept cash
> payment you automatically opt into our e-Toll service, pursuant to which you
> agree to pay us or our toll program administrator . . . for all tolls incurred during
> your rental and all related fees, charges and penalties. . . .  You can avoid the . . .
> fee[s] and any other charges by paying the toll in cash, using your electronic toll
> device, or avoiding any cashless toll road or passage.

Avis Rental Agmts. at 3 ¶ 16, 5 ¶ 16, 7 ¶ 16.  These provisions unambiguously permit renters to

use PToll rather than opt in to HTA's services for two reasons.

First, the language expressly provides that renters can "avoid [HTA's] fee[s]" by "using

[thei]r electronic toll device[s]."   While "electronic toll device" is not specifically defined

elsewhere in the contract, the Court agrees with BancPass that the plain and ordinary meaning of

the phrase encompasses a smartphone on which an app specifically designed to manage the

-21-

payment of tolls is installed. The Court disagrees with HTA's argument that the true meaning of the phrase is limited to transponders that are issued by tolling authorities and send radio signals, such as TxTags and TollTags. Had Avis wished to limit the types of electronic toll devices a renter is permitted to use in order to avoid HTA's fees, it could have used more specific language to so indicate, such as "transponder issued by a tolling authority," "transponder issued by a tolling authority that emits radio signals," or the like. The Court declines to read a limitation into the Avis agreements that is not there. *See Schaefer*, 124 S.W.3d at 162 ("[W]e may neither rewrite the parties' contract nor add to its language.").

Second, the first sentence of the e-Toll provision does not change the analysis. HTA argues the provision "plainly states [] if a rental customer does not pay cash for tolls, the customer automatically agrees to pay HTA, as the toll program administrator, for all tolls incurred." Def.'s Mot. Summ. J. [#84] at 18. The later, more specific provision delineating the more specific ways in which a renter can avoid HTA's fees, however, controls over the earlier, conflicting general statement that renters automatically opt in to HTA's services if they do not pay cash. *See NuStar Energy*, 402 S.W.3d at 467 (citing *Grynberg v. Grey Wolf Drilling Co., L.P.*, 296 S.W.3d 132, 137 (Tex. App.—Houston [14th Dist.] 2009, no pet.)).

The analysis of the Enterprise rental agreements is even more straightforward. Those agreements state in relevant part:

> Optional Charges. The optional Tollpass Service accepted by Renter provides for the daily rental of a toll collection transponder or, in some states, the use of video-monitored toll collection services. In addition to the daily charge for the Tollpass Service, [Enterprise], its affiliate or a third party may separately charge . . . for each toll (or other charge) incurred using the transponder or video monitored service . . . .

> Renter shall pay [Enterprise], its affiliates or agents . . . [a] Tollpass Convenience
> Charge (TCC) . . . for each day Vehicle is operated on a TCC Covered Road and
> Vehicle operator does not pay an applicable toll.

Enterprise Rental Agmts. at 4 ¶ 3(b)(5), (c)(4); 8 ¶ 3(b)(5), (c)(4); 10 ¶ 3(b)(5), (c)(5).[8]  Under

the plain language of these contracts, the "Tollpass Convenience Charge," which is the "daily

charge for the Tollpass Service" provided by HTA, must be paid by the renter only where the

vehicle is driven on a toll road and the "Vehicle operator does not pay an applicable toll."  This

language is even less restrictive than the language of the Avis contracts; the Enterprise contracts

do not specify the ways a renter may avoid opting in to HTA's services, instead merely stating

that so long as the renter pays his or her applicable tolls, the "daily charge for the Tollpass

Service" is never assessed.

The Court cannot agree with HTA's argument PToll is prohibited under the Enterprise

rental agreements because they state HTA "may separately charge . . . for each toll . . . incurred

using . . . video monitored service[.]"  Read in context, it is clear HTA may assess those charges

"[i]n addition to the daily charge for the Tollpass Service," which is itself "optional."  If a renter

never accepts the optional Tollpass Service by failing to pay an applicable toll, thus triggering

the daily charge for the service, HTA has no ability to "separately charge" for the tolls incurred.

This reading harmonizes all relevant provisions in the agreements, including the language

describing HTA's fees as "Optional Charges" and stating HTA's services are "optional" and

must be "accepted by Renter[.]"

The Court therefore concludes the use of PToll does not constitute a breach of the Avis or

Enterprise rental agreements.  As such, the Court finds BancPass does not tortiously interfere

with those agreements as a matter of law.  HTA's motion for partial summary judgment on this

---

[8] *See supra* n. 1.

issue is therefore DENIED, and BancPass's reciprocal motion for summary judgment is GRANTED.

**D.    BancPass's Alleged Tortious Interference with HTA's Contracts with Avis & Enterprise**

HTA does not address the merits of BancPass's request for summary judgment on its claim seeking a declaration PToll does not tortiously interfere with HTA's contracts with Avis and Enterprise, instead stating in a footnote that "neither party has asserted a claim relating to tortious interference of HTA's contracts with rental agencies." *See* Def.'s Resp. [#91] at 15 n.20. HTA is incorrect. While BancPass's complaint may be inartfully pled, it fairly raises a request for this declaratory relief. *See* Second Am. Compl. [#50] ¶ 34 (alleging HTA has "incorrectly stated that merely permitting PToll to function constitutes tortious interference against HTA's contracts with . . . the tolling authority"), ¶ 37 ("HTA's threats . . . have created an actual, mature controversy . . . with respect to whether consumers choosing to use . . . PToll . . . interferes with HTA's contracts with rental car companies[.]"). As HTA declined to respond to BancPass's summary judgment argument, the Court grants BancPass's motion concerning same as unopposed.

Alternatively, turning to its merits, the Court finds PToll does not tortiously interfere with HTA's contracts with Avis and Enterprise as a matter of law. As previously noted, the Avis–HTA contract states: "During the term, [Avis] shall not obtain from any other party, nor shall it provide on its own behalf or account, any electronic tolling collection services." Avis Service Agmt. ¶ 6. Similarly, the Enterprise–HTA contract states: "The parties hereby acknowledge and agree that HTA shall be the exclusive provider to Enterprise and its affiliates . . . of all ETC [Electronic Toll Collection] services[.]" Enterprise Service Agmt. ¶ 12. The plain language of

these agreements indicates nothing more than each rental car company's obligation not to obtain from any other provider, or to provide of its own accord, any electronic tolling collection services. BancPass and PToll do not provide Avis or Enterprise with electronic tolling collection services, and thus, PToll does not tortiously interfere with the respective agreements between Avis, Enterprise, and HTA.

BancPass's motion for summary judgment on this ground is GRANTED.

**E.      BancPass's Alleged Tortious Interference with HTA's Contract with TxDOT**

Finally, BancPass seeks summary judgment on its claim seeking a declaration PToll does not tortiously interfere with HTA's contract with TxDOT.[9]  While this argument is somewhat underdeveloped given the parties' focus on other areas, the Court finds, on the present record, that BancPass is entitled to summary judgment.

Simply stated, the parties disagree about whether the contract between HTA and TxDOT, entitled "Service to Provide Management of Rental Car Fleet," permits the simultaneous registration of a single vehicle's license plate to both HTA's and BancPass's fleet accounts.  *See* Pl.'s Mot. Summ. J. [#86-21] Ex. S (HTA–TxDOT Agmt.) at HTA000165.  BancPass contends nothing in the HTA–TxDOT contract prohibits such simultaneous registration or otherwise gives HTA the exclusive right to pay electronic tolls on the vehicles registered to its fleet.  In response, HTA points to the provisions (1) requiring HTA to "[h]ave established agreements with rental car agencies to manage the agencies' toll obligations" and (2) stating TxDOT will "[c]ompare license plate data from images to vendor's [HTA's] license plate information" and "[d]educt [the pay-by-mail] rate from vendor's [HTA's] established pre-paid account," contending these

---

[9] Confusingly, in HTA's response to BancPass on this issue, HTA states that "HTA has not moved for summary judgment on its claim that PToll tortuously [sic] interferes with HTA's TxDOT Rental Fleet Agreement." Def.'s Resp. [#91] at 17.  HTA, however, has brought no such claim.  *See generally* First Am. Countercl. [#47].

provisions together establish its claimed exclusive rights.  *See* Pl.'s Mot. Summ. J. [#86-21] Ex. S (HTA–TxDOT Agmt.) at HTA000166, 69.

The Court disagrees with HTA's reading of the contract.  Nowhere in the provisions HTA cites is TxDOT prohibited from registering a vehicle license plate to more than one fleet account.  Reading these provisions to give HTA exclusive rights would require reading the word "exclusively" into the language: the agreement does not guarantee TxDOT will "compare license plate data from images to HTA's license plate information *exclusively*."  Again, the Court may not create contractual rights by inserting additional words into agreed-upon contractual language. *See Schaefer*, 124 S.W.3d at 162.  Rather than establish exclusivity, these provisions merely describe the general steps TxDOT takes in processing electronic tolls.  In fact, additional language in the TxDOT contract expressly discredits any claim it awards any one "vendor" exclusive rights: the contract expressly states that TxDOT "will award to multiple vendors." HTA–TxDOT Agmt. at HTA000171.  Thus, the contract itself implicitly acknowledges TxDOT will be required to compare the license plate data it collects from tolling stations to the license plate information supplied by multiple vendors.

BancPass's motion for summary judgment on this ground is GRANTED.

### Conclusion

In sum, the Court finds: (1) Counts I, II, and III of HTA's counterclaims may proceed to trial; (2) BancPass's defamation claims may proceed to trial, and BancPass may seek exemplary damages concerning only the letters to Apple and Google; (3) BancPass is entitled to a declaration PToll does not tortiously interfere with the agreements between Avis, Enterprise, and their customers, resolving both its affirmative claim and HTA's counterclaim to that effect;

(4) BancPass is entitled to a declaration PToll does not tortiously interfere with the agreements between HTA, Avis, and Enterprise; and (5) BancPass is entitled to a declaration PToll does not tortiously interfere with the agreement between HTA and TxDOT.  This case will therefore proceed to trial on BancPass's defamation claim and Counts I, II, and III of HTA's counterclaim.

Accordingly:

IT IS ORDERED that Plaintiff BancPass, Inc.'s Motion for Partial Summary Judgment and Rule 12(c) Motion to Dismiss Defendant's Requests for Declaratory Relief Counts I, II, and III [#86] is GRANTED IN PART and DENIED IN PART as described in this opinion; and

IT IS FINALLY ORDERED that Defendant's Motion for Traditional Summary Judgment on Plaintiff's Claims and Partial Summary Judgment on Defendant's Counterclaim [#84] is GRANTED concerning BancPass's inability to seek exemplary damages concerning the TxDOT letter and DENIED in all other respects.

SIGNED this the 24th day of August 2016.

_Bamsparks_

SAM SPARKS
UNITED STATES DISTRICT JUDGE